## LEVI KING v. THE STATE.

1. EVIDENCE — PRACTICE. — The proof cannot be so plenary on one side as to justify the exclusion of legitimate countervailing proof offered by the other. To hold otherwise would be to substitute the court for the jury as the judge of the weight of the evidence and the credibility of the witnesses.

2. Same — Murder — Threats. — In a trial for murder, it appears that no witness saw the killing, but the State introduced an admission of the defendant to the effect that he killed the deceased in self-defence while the latter was pursuing him with a pistol. The body of the deceased was found with a loaded pistol lying by it. The defence offered proof that the deceased, a short time before the killing, threatened to kill the defendant. *Held*, that this evidence should have been admitted, notwithstanding that there was strong proof that the defendant was waylaying the deceased when he shot him.

3. Insanity. — The rulings on insanity in *Webb.* v. *The State*, *ante*, p. 490, referred to and approved by a majority of the court.

4. Same. — Consider *in extenso* the opinion of Hurt, J., in the present case, in exposition of his dissent from the rulings on insanity in *Webb* v. *The State*, *supra*, and in support of the propositions that, intent being an essential ingredient of crime, and sanity indispensable to intent, when the evidence for the defence has overcome the legal presumption of the defendant's sanity, the State has the burden of proving that fact to the satisfaction of the jury beyond a reasonable doubt, and the defence is entitled to have the jury so instructed.

Appeal from the District Court of Wood. Tried below before the Hon. J. C. Robertson.

The indictment charged the appellant with the murder of H. W. Harrington, on March 22, 1880, by shooting him with a gun. The jury returned a verdict convicting the appellant of murder in the first degree, and assessing his punishment at death.

The deceased was a physician in Wood County, and was assassinated within a short distance of his house, about nine o'clock in the night of the day alleged in the indictment. The appellant lived in the same neighborhood, on a rented farm. No witness saw the shot fired by which the deceased came to his death, though several heard the report of the gun. By circumstantial proof, however, and statements of the defendant, the prosecution seem to have fixed the perpetration of the deed upon the appellant, whose principal defence appears to have been insanity.

L. H. Thompson testified, for the State, that he was acquainted with Dr. Harrington, the deceased, who was killed

on March 22, 1880, about nine o'clock at night. The witness resided near the deceased, on the latter's place, and was in bed when the gun fired, some one hundred yards off. He ran to the door when the gun was fired, and asked the deceased if that was him. When he called the second time, the deceased answered, "Yes," but had previously called to his wife. When the witness reached the deceased he was nearly dead. He was shot on the right side of his body, in front, the wounds extending from his face to his groin, and made by a great many shot, of various sizes. He (witness) asked deceased what shot him, to which he made no reply. The deceased fell about one hundred yards from his house, in a road which led around his plantation. The witness, his brother, his sister-in-law, and Miss Carrie Campbell carried the deceased into his house. In about two hours Dr. Minnis arrived.

Next morning witness and others found some gun-wadding near by, but discovered no tracks leading from where the body fell. They found the tracks of a man near the garden, and leading to a stump in an oat-patch where a mule had been hitched, and near this stump, which was seventy-five yards back from the house, near a road leading through the plantation, they found the tracks of a mule and dogs. They followed the tracks of a man from the garden towards the house, and followed the tracks of a mule and some dogs through the field in a north-easterly direction from where the mule was hitched. The witness was with Mr. A. Crow when he measured the tracks of the mule in the oat-patch and at the bars entering the field, and knew that they were exactly alike. On the morning of the killing, the witness saw the defendant come in at the bars, riding a small mouse-colored mule, and with two yellow dogs following him. He was coming out of the woods from a north-east direction, and through the field, along the road, westward. The defendant stopped and talked with the witness, and in the conversation said that he was in a

hurry, as he had to go to Quitman. The witness found a man's tracks near the fence where the deceased lay, which which led to where the mule was hitched. The deceased lived ten miles from Quitman, and King (the defendant) lived three miles from deceased, in a westerly direction. The witness recognized the prisoner at the bar as Levi King, and stated that the shooting took place in Wood County, about ten miles from Quitman.

Cross-examined, the witness testified that the road referred to in his direct examination led by the house of the deceased, in and around the farm, and by J. J. Moore's place, and into the Quitman Road. Witness was asleep when the shot was fired. His family consisted of himself, his brother, and his sister-in-law, who has since become his wife. He saw horse-tracks near where the body of the deceased lay, leading from the deceased's house. These tracks appeared to be cut in the ground, and the horse making them seemed to have been moving in an unusual gait. It was a bright moonlight night on which the deceased was killed. The witness saw Thomas Campbell, a brother-in-law of the deceased, next morning, with a pistol in his hand, between the place where the deceased was killed and the house. He (witness) saw the defendant that morning, at about eight o'clock, come through the bars into a neighborhood road that led through the field by the deceased's house to Winsboro. The deceased was going south when killed. The witness tracked a man from where the mule stood in the oat-patch some seventy-five yards, to a point behind the garden. The witness knew that Mr. Fowler did not live on the deceased's place. To go to Fowler's from the deceased's place, one would have to travel in a northerly direction. The deceased was not going in that direction, but in an opposite one, when killed. Witness had heard that Fowler had sickness in his family. It was two hundred and twenty-five yards from where the mule was hitched in the field to where the witness first found

the man's tracks. He saw the man's tracks one hundred yards from where the body was found. They were on the left of the road, looking in the direction the deceased was going when killed. The mule travelled in a northerly direction after the killing. The witness did not go out at the bars, or in the direction of King's house.

Reëxamined by the State, the witness said that the defendant's house was in an easterly direction from the bars, and that he came from a north-east direction, and not from the direction of his house. The tracks measured at the bars by A. B. Crow were those made by defendant's mule on the morning before the killing.

Mrs. Emma Thompson, second witness for the State, testified that she lived about two hundred and forty yards from the house of the deceased. She was at home, and not in bed, when the deceased was killed. She was standing in her door looking south, when the gun was fired north of her, at about nine or ten o'clock at night. When the gun fired, the deceased called out three or four times, " O, ma!" It was a clear, still, moonshiny night. When the gun fired, witness walked out on her gallery and looked in the direction from which she heard the report. She saw a man, dressed in a dark-looking suit, running towards her house from the direction where the deceased was. At a point about sixty yards south of the body he turned squarely off to the left, in the direction of the field. The deceased was carried to the house, and the wife of deceased was met on the way.

Cross-examined, the witness stated that from the deceased's house the body lay about one hundred and fifty yards when found. The witness was looking when the gun fired. She went to the gallery and saw smoke. She also saw a man about fifty yards from the body, coming towards her. She saw no gun then, nor did she see a gun when, turning, he came in plain view. She could have told whether or not the man had a gun. She knows the defendant, but did not

know the man running from the body. She saw a pistol lying within three feet of the body, and also saw the deceased's horse. The Fowler family lived in a north-east direction from the deceased. Deceased was not going towards Fowler's, or any road leading in that direction. Fowler's wife was sick. The deceased did not have his pill-bags with him when killed. They were found afterwards in his buggy. The man witness saw running, after the gun fired, ran within fifteen or twenty steps of witness's house before he turned towards the field. After turning, he came in plainer view.

A. B. Crow, the next witness for the State, testified that he was at the house of the deceased on the next morning after the killing. He saw mule-tracks near a stump, where a mule was said to have been hitched, and followed them some distance through the field. He measured those tracks, and measured also others at the bars outside of the field, pointed out to him by the witness Thompson. They were much alike, corresponding exactly, and appeared to have been made by a mule under medium size.

Cross-examined, the witness stated that he measured the mule-tracks outside of the field in a clear, flat place, and those in the field in rather soft, ploughed ground. He saw some horse-tracks near where the deceased was killed, going apparently in a southerly direction. There were woods all around the field in which the mule was hitched, but the witness thought there was a clear, open view from where the deceased was killed to Thompson's house. The horse-tracks referred to were cut deep into the ground, and the horse making them seemed to have been going fast. The distance from deceased's to Thompson's house is about three hundred yards. The witness had known the deceased and the defendant for about five years, but had not seen much of the defendant of late. From what he knew of defendant's character, it was good; he was a quiet, peaceable, and inoffensive man.

S. G. Hilliard, for the State, testified that he lived about one and a half miles distant from the deceased, and was at the latter's house about daylight on the morning after the killing. With others, he went to the place where the deceased was killed, and made an examination of the vicinity. He found a man's track near where the deceased was killed, and traced it in the direction of the fence, where it crossed. They followed it into the field, and to where the mule had been hitched to a stump in the oat-field. They found that around the stump a mule and dogs had done much tramping, but they could not find the tracks of the man; nor did they find them again. They traced the mule from the stump through the field to the fence, in an easterly direction, and found where the fence had been let down and put up carefully. The mule's tracks passed through in the direction of Chancey's. They followed it near to and around Chancey's premises, and lost it. Looking carefully, they again found where the tracks led off from Chancey's in the direction of Henderson Hally's, west; thence south-west, to L. H. Davis'; thence south-east, to the Quitman and Winsboro Road, leading by Morrow's. In all the rounds, witness could see dog-tracks along with the mule-tracks. The party left the tracks after they struck the big road. The witness tracked a man from where the deceased was killed to where the person got on the mule at the stump. From the defendant's house to Quitman by witness's house is a direct route. From the defendant's place to Quitman by the houses of deceased and Morrow is an out-of-the-way route.

Cross-examined, the witness said that he did not know the nearest road from the defendant's house to Quitman, but had often seen defendant travelling to Quitman by the deceased's and Morrow's places. If the traveller to defendant's house should pass witness's house, his nearest route would be to pass the deceased's and Morrow's places. Mr. Vickers, Mr. Blackwell, and the Thompson boys were helping in the

hunt for the tracks. The killing took place about two hundred yards due south of deceased's house. From this point the Thompson house was in plain view, and about fifty yards distant. Witness saw tracks about ten or fifteen steps from where the body lay, going in an oblique direction towards the field, but saw none going towards the Thompson house. The witness first saw the deceased's pill-bags in his house, the day after the shooting. The deceased, when killed, was not going towards Fowler's house (north-east), but in an opposite direction. Fowler's wife was sick. The witness had known the defendant for years. He had the reputation of being a good, peaceable, inoffensive citizen. A road ran from the deceased's house to Mrs. Thompson's at the place where the deceased was killed, and where the horse had wheeled.

George Weems, for the State, testified that he was at the house of the deceased the morning after the killing. He saw some tracks near where the mule was hitched, and was with Davenport measuring them. He went to the defendant's house the next morning, and measured some tracks freshly made in the garden. The tracks in the field and the fresh tracks in defendant's garden were exactly alike, and of same size — about those of a No. 8 shoe.

Cross-examined, the witness said that he was then, and for several years had been, deputy-sheriff. He went to the defendant's once to summon him as a juror. Defendant was sitting on the steps when witness went in, but witness saw nothing wrong about him. He did not obey the summons to attend court, and witness thinks the deceased rendered his excuse for him. The witness did not know the general character of defendant.

J. H. Morrow, the next witness for the State, testified that he lived about six miles east of Quitman, about five miles from the house of deceased, and about five miles from defendant's house. The deceased and his wife came to the house of witness in a buggy in the morning before the kill-

ing that night.   In the evening deceased and witness went to town together, and met the defendant about two miles from town, going towards his home.   Witness and deceased got back to witness's house about sundown, when deceased and his wife went home.   Both defendant and witness live on the main road running south from Winsboro.   A road turns off a short distance from witness's house and leads into the North Winsboro Road, and in the direction of deceased's house.

Cross-examined, the witness said that the deceased had his pill-bags in the buggy during this trip to town.   He (witness) had known defendant a long time, and looked upon him as a quiet, peaceable, upright, and inoffensive man.   They met the defendant about half-past one in the evening.

Thomas Cook testified, for the State, to the effect that he had been in the town of Mineola the day of the killing, and saw the defendant in Quitman, and about five miles from there on the Winsboro Road ; both witness and the defendant were going in the same direction, and towards Winsboro. The defendant, who was riding a mule, overtook the witness and got in his wagon, tying his mule behind it.   He asked witness if he had met Mr. Morrow and the deceased, and said that he had met them.   He got into witness's wagon at about the seven-mile post, saying that he was in a hurry to get home.   He had a yellow dog following him.   He got out of witness's wagon about a quarter of a mile from Morrow's, and this side of where the road turns off to go to deceased's house.   Witness saw him shortly afterwards riding slowly behind the wagon, but soon lost sight of him.   When defendant got into the wagon, witness asked him if he was not afraid his mule would break loose, and he answered that if it did he would make his dog catch him.

John T. Craddock, for the State, testified that the defendant was in his office in Quitman on the day of the killing.   He came in to have some deeds recorded which had

been filed in the office for some time, but not previously recorded because the fees had not been paid. They were deeds conveying to his wife, for love and affection, all his real and personal property.

Cross-examined, witness stated that the deeds had been previously left in the office, and defendant came that day to see about them, and requested witness to record them, saying that he would pay the fees at the next term of the County Criminal Court, which was to convene on the first Monday in April. Witness had known defendant some time, and once lived near him. He knew defendant's general character well. Had never heard anything against him out of the way. He was a thrifty young man.

On reëxamination, the witness said that the defendant appeared to him to be a sane man when he came into the office. He came in eating pecans. The deceased had filed a complaint against defendant for libel, and the case was to be tried at the ensuing April term of the court.

Re-crossed, the witness said that the first complaint for libel was filed in the justice's court on the seventh day of July, 1879, and in the County Court on July 30, 1879. Another complaint against the defendant for the same offence was sworn to August 4, 1879, and filed in the County Court September 1, 1879. It had been continued twice by consent: by the defendant at the January term, by consent at the February term; and at the April term bond for $200 was forfeited. The defendant did not come back to pay for the recording of the deeds as he promised, nor come to court at the April term. On a Monday morning at the May term of the court he came into the town of Quitman, and was taken charge of by the sheriff on the charge of murdering the deceased.

Elam Powell testified, for the State, that on the day of the killing the defendant rode up to him, near Quitman, and asked if his (witness's) name was not Powell, and if he had not lived with the deceased, and if "Dr. Harrington

was not a d—d rascal.'' He said that deceased had acted the·rascal with him, and that he would bet that deceased would not live two months. He had a yellowish dog with him.

Cross-examined, the witness said that he once lived at the deceased's, but left there and went to Stinson's. He had been staying around Harrington's since the trial commenced. Mrs. Harrington was the first person to whom he had told what he knew about the matter of the killing. Afterwards, when he went back to Stinson's mill he told it there. The witness had worked for Mrs. Harrington, widow of deceased, on her place, pretty much ever since the killing. Witness's brother-in-law, Mr. Guess, lives on the place, and the witness lives there likewise.

J. H. McClendon testified, for the .State, that he was at the deceased's house on the day he was killed. Witness lived about a quarter of a mile from deceased's house, on the road leading from there to J. J. Moore's and Hilliard's houses. He saw a man riding a small mule, followed by two yellowish dogs, going in the direction of the deceased's house. He seemed to have something before him, but witness did not know what it was. The night was clear and bright, and the moon was shining. In about the half of an hour the witness heard the report of a gun. The witness had gone to bed, but had not gone fully to sleep.

Cross-examined, the witness stated that the man passed within ten or fifteen steps of his house, and he tried to recognize him, but could not, but recognized the color of the dogs. The man had something before him that looked to witness like a coat. When witness heard the screams, after the firing, he went down to where the deceased was, and found him lying in the road. He had been moved a few paces ·from where he fell. .Witness saw horse-tracks between the house and the point where deceased fell, but saw no man-tracks between that point and the house.

W. H. C. Perkins testified, for the· State, that he· lived

about one-half mile from the house of deceased. He saw
the defendant, about one and a half hours by sun, pass by
his house on the big road that runs by J. R. Moore's, and
not on the road that goes to the defendant's house. He
was on the Winsboro and Webster Road. There was a path
turning off after passing defendant's house, which ran in
towards deceased's house and back of his field. Defendant
did not turn off on this path. The deceased and his wife
passed witness's house while witness and family were at
supper, on the night of the killing.

Ellen Kennedy (colored), sworn for the State, testified
that she lived on J. R. Moore's place, about a mile from the
house of deceased. Late in the afternoon on the day of the
killing, she saw a man riding a mule, carrying a gun, and
followed by two dogs. Didn't know who it was. Witness
knew Levi King, the defendant, when she met him in the
road. The man she saw was travelling from towards the
towns of Winsboro and Webster.

Cross-examined, the witness said she did not know how
high the sun was when the man passed Moore's. One of
the dogs spoken of was a large spotted one, the other a
small one.

Oliver Houston testified, for the State, that he lived about
a quarter of a mile from the defendant at the time of the
killing, and helped him catch his mule on Monday morning.
It was a mouse-colored mule. Witness left home before the
defendant did. The defendant told witness that he would
be back by nine o'clock, but he did not return. Witness did
not see the mule or either of the dogs for some time after-
wards. Deputy-Sheriff Estes was at defendant's house on
Monday morning looking for defendant, who, he said, had
promised to meet him. Witness has not seen defendant,
his mule, nor his dogs at home since. He had lived with
the defendant for some time.

Cross-examined, the witness said that the defendant had
very "strange ways." On one occasion, during the past

winter, he directed the witness and another to prepare for the slaughter of some hogs. Witness built a fire and made other preparations, while defendant went to the house to get his gun to kill the animals. Defendant did not return until nearly sundown, when " something seemed wrong with him." On the day of the killing of deceased, about ten or eleven o'clock, Mrs. King sent witness to look for defendant. He inquired and searched for him throughout the neighborhood, but hearing nothing of him, returned home. The witness had often hunted for the defendant when he would go off in his crazy spells. From what witness knew of defendant he pronounced him insane, and testified that he had been so for two or three years, being at times much worse than at others. Mrs. King and witness planted the garden on Monday, witness having ploughed it the same day. The defendant was not at the place after the garden was ploughed at all. He (defendant) ploughed the Irish-potato patch, outside the garden, on the Saturday before.

C. H. Glenn, for the State, testified that he lived at Hawkins, twenty-two miles from Quitman. He saw the defendant at Hawkins between daylight and sun-up on the morning after the killing of deceased. He (defendant) came into witness's saloon and bought a bottle of whiskey. He rode a small mule, and had a shot-gun with him. Leaving, he went towards Belzoria. From the witness's place to deceased's the distance is twenty-seven miles.

J. L. Mathis, sworn for the State, testified that he was the ferryman at Belzoria, on the Sabine River, and that the defendant resembled a man who crossed at his ferry two day's before a party of men came along hunting for King. He had a gun, was riding a small, dark-colored mule, and had two yellowish dogs.

Cross-examined, the witness said that the defendant had trouble in getting his dogs over — that when he would get one in the boat the other would go out. Witness suggested that he tie them with the boat-rope, but he refused, saying

that he could not tie a rope, and that he would rather lose his mule than his dogs. His actions were very strange.

Thomas Harris, a resident of Franklin County, testified, for the State, that the defendant, whom he knew, came to his cow-pen, where he was milking, one evening soon after the reported killing of the deceased, and asked for his supper. The witness directed him to go into the house, which he declined to do; and witness, on his request, brought him his supper, and he ate it at the cow-pen. Witness said to him while he was eating that if he was guilty of the crime imputed to him, he (witness) would not have seen him at his house for $10,000. The defendant answered that he had killed Dr. Harrington; that he had to do so, because the deceased had all "hold" on him in law, and that he (defendant) had no chance at all. He asked witness to tell his brother where he could find his mule. Witness told defendant that he could stay that night in his loft, but he declined, saying he preferred being where he could run. Witness then went to a neighbor's, and when he returned the defendant was gone.

The witness, on cross-examination, stated that the defendant was walking when he came up to the cow-pen. He did not know from which direction he came. The witness had heard of the killing of deceased. A crowd of five or six men passed the witness's house a day or two afterwards looking for King. Bill McGill, armed with a pistol and shot-gun, was among the number. The crowd took the witness into the middle of an old field, and out there McGill said to witness that he (witness) knew something about King, and, "by G—d! had to belch." Witness was much frightened. He had told Mr. Campbell, in his house, all that he knew. Witness had been placed under the rule, with instructions from the court, when this trial commenced. Mr. Campbell, the brother-in-law of deceased, took witness up to Sheriff Williams' house to supper, and talked to him about the case, and repeated some things that the defendant

had said to witness, and asked witness if defendant did not say that he had killed the deceased in fraud, and to get revenge, and other such things. The witness took a drink of peach-and-honey during the evening of the day on which he was giving this evidence, and was under the rule at the time he talked to Mr. Campbell.

Daniel Knight, for the State, testified that on or about the first Sunday after the deceased was killed he saw defendant lying in a cluster of bushes back of his house, six miles east of Winsboro, on the Pittsburg Road. When witness discovered him he got up, and witness, being afraid of him, started off. Defendant threw his hands down by his side, stiffened his arms, and called out twice to witness, "I was obliged to kill that man." Witness would not permit defendant to approach him nearer than twenty or thirty steps, and at that distance they conversed. Defendant said that he was compelled to kill Dr. Harrington ; that he (defendant) had taken supper at his sister's, and that while passing Harrington's, on his way home, he (Harrington) got after him with a pistol and ran him down, when he wheeled and shot him. The witness then spoke to him about the mule being hitched in the oat-patch ; to which he made no reply. He said that the reason he ran away after the killing was, that he had no witness ; that Maj. Connolly saw part of the difficulty, and that he (defendant) heard Connolly ask deceased for a bridle as he passed. He begged witness not to inform on him. Defendant did not appear to be out of his mind, but reasoned well.

Cross-examined :· "King said that he wanted to get away ; that if I knew the circumstances, I would not blame him. 'I killed Dr. Harrington in *self-defence;* he was running me down, with his pistol drawn, and I had to kill him.' "

Maj. Connolly was introduced by the State, and testified that he lived with the deceased. On the night of the killing, the deceased and his wife reached home from Quitman a little after dark. The witness had just got in from Wins-

boro, and was lying down. The deceased took his horses out of the buggy, and witness removed the harness. Deceased presently asked witness for his bridle. Witness got it for him, and left him saddling his horse to go to Mr. Fowler's. Presently, it being about nine o'clock, the witness heard the report of a gun. When found, the deceased did not have his pill-bags; they were afterwards found in his buggy.

Dr. W. S. Minnis testified, for the State, that he saw the body of the deceased soon after the killing. There were nineteen wounds in his body, extending from the cheek to the groin, including his hands, inflicted by low-mould shot. The witness noticed some tracks to the right of a good-sized hickory tree, near the road.

Cross-examined, the witness stated that he had always understood that the defendant was peaceable and quiet. He had attended him professionally, and saw him once after he had gone off into the woods in one of his spells, and was brought in by his neighbors. He looked dull on that occasion, but the witness did not regard him out of his mind. His malady, in the opinion of the witness, was brought on by the abuse of his sexual organs, either by masturbation or too frequent sexual intercourse. The effect of such abuse is not to cause insanity, but the person would be inclined to avoid society. Masturbation can be practised to an extent to impair the mind, and the witness had seen such persons in insane asylums. Persons who abuse themselves by masturbation seek habitually to exclude themselves from society, and this inclination does not generally affect them by spells. The deceased usually carried a Smith & Wesson pistol. The witness and deceased were partners in the practice of medicine, and friends. The witness admitted that masturbation produces hallucination of the mind.

Reëxamined, the witness said that about the previous Christmas the defendant was capable of knowing right from wrong. The visit of witness to defendant, spoken of in the

cross-examination, was made about two years previously. Masturbation makes a man submissive, destroys his combativeness, and makes him seek to avoid refined society. It does not defeat or destroy discernment.

C. B. Gorman testified that he saw the defendant in Winsboro the Saturday before the killing. A young man was making an account and complaint against defendant in the office of the justice of the peace. The witness interposed in defendant's behalf, and presented the account to defendant, who said he would compromise. Defendant told witness that he was in a lawsuit, in much trouble, and hard up; that he was almost " minced;" and requested witness to meet him at Cowsey's on the following Monday morning at eight o'clock. He failed to keep the appointment, and witness went to his house, and failed to find him there. Witness had an execution against the defendant in favor of the deceased from a justice's court. He had already levied one execution in favor of the deceased on the defendant's mules, and was going to levy the other on the same mules. Defendant seemed " all right " when witness saw him the Saturday before the killing.

Cross-examined, the witness said that the first execution was for forty-odd dollars, and had been paid off, and that the second was for $12, unpaid. The witness spoke to him about the business with the boys who were filing the complaint against him. He said that he supposed he had done wrong in taking their clothes from them, and asked witness to help him out. The deceased had had some trouble with his neighbors.

Dr. W. B. Payne was the first witness placed on the stand by defendant. He lived four miles west from Winsboro, in Wood County, and had known the defendant for about seven years, though he had seen little of him for the last two years. The summer preceding the trial, he came to witness's house at a time when witness was lying on his gallery; said something, and took his seat in a chair near by,

which he occupied for an hour without speaking. After the lapse of that time he asked witness if he had seen any stray horses about, and, receiving a negative reply, he left without speaking again. After a short while he returned, and asked witness if he had any money to shave notes with; to which the witness replied that he had not, and defendant left, the witness seeing no more of him. The witness had heard that defendant was deranged, and was somewhat alarmed when he came up. He did not conduct himself in a manner usual to him when witness had seen him before, and witness did not think his mind was right.

Cross-examined by the State, the witness said that the defendant did not look natural. His look was not sleepy, but wild and reckless, and he would not look at witness.

W. E. Payne, living west of Winsboro, testifying for the defence, said that he had known the defendant six years, and both before and after he married, and had noticed some change in him since he first met him. He saw the defendant in Winsboro on the Friday before the Monday on which deceased was killed. He had a conversation with him then, and had had one with him about a year previous. He told witness he was troubled, and referred to a pig passing by, and asked the witness to come to see him. While talking of his married life, tears came to his eyes and ran down his cheeks. He said that his wife was a good woman, and that he had prayed over her; and he left the impression on the mind of witness that he was laboring under religious conviction. The witness thereupon told him that he (witness) was glad to see him in this condition, and the defendant replied that he thought witness would be sorry when he (defendant) was a ruined man. He asked witness what he should do, and witness advised him to go to church, and he said that he would. The witness saw nothing else wrong with him.

The substance of the testimony of C. P. King was, that he was a brother of the defendant, and had noticed a very

considerable change in his mental condition during the last three years. These crazy spells usually came on him in the spring, commencing generally in February or March, and of late had become more frequent than formerly. When attacked by them, he would frequently go off into the woods and stay as long as two days and nights. The witness had frequently looked for and found him in the woods; found him on one occasion sitting on a log, after he had been gone two days and nights. When he saw the witness and others with him, he got up and started off, but was overtaken, when he explained his conduct only by saying that he was a ruined man. One time, during one of these absences, he lost his gun and coat, and could tell nothing about them. At another time he was found in the woods wet up to his waist, looking worn and haggard. He could not tell where he had been, and said that he could not help going. Witness hunted him once the winter before this trial. He did not know what was the matter with defendant unless he was deranged.

Cross-examined, the witness said that the defendant had been married about four years. He had his first attack of the malady about three years before the trial; he had another about one year prior to the last March. Defendant had had some trouble with a man named Smith before he was married. When suffering under the attacks referred to, he looked dull and sleepy. He did not appear inclined to fight, nor did he rave.

John Kennedy, testifying for the defence, said that he had known the defendant for several years, and helped search for him almost every time he wandered off, and was present a number of times when he was found. He was crazy for three years, "right straight along." The second time he was hunted for, he was found sitting on a log. He got up and started to leave when he saw the searching party, saying that he was a ruined man. The last time the witness hunted for him was in the spring of 1879, on which occasion

he was found, after a two days' hunt, in his corn-crib loft. He looked wild. He has changed a great deal since he married. Has not worked or done anything much for two years. He did not attend to his crop last year, nor had he done anything towards planting a crop this year, up to the day of the killing. His farm, before he got into this condition, had been kept well and nicely, but has gone down greatly during the last twelve or eighteen months. It was the opinion of the witness that the defendant was crazy every time he went off in the manner described. When laboring under one of his attacks, he looked wild and his eyes flashed.

J. R. Moore testified, for the defence, that he had known both the defendant and deceased well. Had seen the former often of late years, when he did not act and look as he did formerly. The latter was a clever gentleman, not considered dangerous, but one who " loved to blow and brag."

Calvin Chancey, for the defence, testified that he had known the defendant for several years. He held at one time a note against one Goldsmith, on which defendant was security. The defendant called on witness and wanted him to make that money. He became satisfied when witness told him that it was all right, but called again a time or two shortly after, and had similar conversations. Witness thought, from his actions, that there was something very wrong about his mind. The witness did not know enough about him before, to know whether or not there had been any change in him.

L. L. Landers, defendant's brother-in-law, testified very much as others regarding the peculiarities of the defendant, and his habit of wandering off into the woods when under the influence of his malady. The witness denied that he had ever said to Dr. Minnis, or any one else, that " Levi King is gone now, and he is not as crazy as perhaps people thought;" but did say to Goldsmith that " Levi King has

gone now, but he is the sharpest old rat that ever cut a shuck.'' When the defendant came home from the trips he would take, he did not appear to know where he had been or what had occurred.

Calvin Chancey, testifying for the State, said that he was at the deceased's place the morning after the killing, and after other parties had gone out looking for tracks. He saw some horse-tracks leading from the residence to the place where the body was found. The tracks indicated that the horse was in a run. The witness examined on each side of the road where the body fell for the tracks of a man, but found none. He looked around the large trees near, and found no signs of such tracks. The ground was soft around these trees. The witness saw some gun-wadding which seemed to have been fired out of a shot-gun, and noticed where a shot had struck a tree about ten or fifteen feet north of where the body was found. Judging from the range of the wadding, and the position where the body fell, and the range of the shot which struck the tree, the party who fired the shot must have stood in the road in front of the horse whose tracks the witness noticed.

Dr. D. R. Fowler testified, for the defence, that he had been practising medicine for about seven years. Self-abuse has different effects on men, and is said to produce a condition of insanity, sometimes consumption, epilepsy, general debility, and cowardice ; and when it runs long enough, will produce general insanity. The witness had never known, in his own experience, of a case in which a person had to be confined on account of masturbation.

Cross-examined, the witness said that he saw the defendant in Quitman on the afternoon of the day of the killing. He inquired of witness for Dr. Leverett, and left a dollar with witness to pay Dr. Leverett a hotel-bill. Witness did not think anything was wrong with him on that occasion. He looked a little strange, but the witness thought he was sharper than he looked to be.

Mrs. M. A. King, wife of the defendant, gave a detailed account of the peculiarities of defendant when under the influence of his malady, corresponding with the accounts given by other witnesses. Her oldest child, now deceased, had been named for Mrs. Harrington, wife of the deceased.

On cross-examination, she stated that she saw the defendant on the Thursday after the killing on Monday, but he said nothing to witness about the killing. Witness had not noticed that the gun was gone, but missed the two dogs the day after the killing.

About the substance of the evidence of the Hon. Jonathan Russell was, that he had known the defendant for about ten years, and had at one time lived within about one mile of him. Had always understood his character to be that of a peaceable and quiet citizen; and he was a thrifty and prosperous farmer, so far as the witness knew, up to the winter of 1878–9. During that winter the witness, who some three years before had removed to Clay County, visited Wood County and remained about a month, and discovered something wrong about the defendant's mental faculties. He appeared a little strange and wild. The witness had rented the defendant his homestead, in Wood County, and in making his contract discovered this mental derangement. The witness returned in March, 1880, when the defendant paid him the rent, but had not done some repairing provided for in the contract. His work was not worth much, nor had anything been done right. In making fence, the defendant would place eight-foot rails on ten-foot panels, and sometimes he put one end of a rail on the fence and the other in a bush hard by. The contract provided for the building of a cross-fence at a certain point. He built it at an entirely different place, and where any sane man would have known it was not needed. All of his acts indicated an unsound mind, and witness, after his last talk with him, pronounced him *non compos mentis*. The witness had a settlement with him on the Friday before the killing,

at which time, in the opinion of the witness, he was wholly *non compos mentis*, and not capable of judging right from wrong.

The State introduced Thomas Campbell in rebuttal. He testified that the pistol found near the body was loaded, but did not appear to have been snapped. A tree about ten feet from the road had a shot in it. The wadding was scattered some twenty or twenty-five feet. The tree struck by the shot and the wadding was on a line with a large hickory on the side of the road. There were no tracks about the hickory tree.

J. A. Noel testified, for the State, that he saw the defendant on the Winsboro Road on the evening of the killing. He lived on that road, and it ran by Mr. Morrow's and Mr. Hilliard's. On cross-examination, he stated that the road which led from Mrs. Evans' place to the defendant's passed by the deceased's house.

Dr. T. N. Skeen testified, for the State, that he had known the defendant for nine or ten years. He saw and had a conversation with him on the Saturday before the killing, and he then showed no evidences of insanity.

The defence proposed to prove by J. R. Moore that the deceased, a short time before he was killed, made serious threats against the life of the defendant. On a general objection by counsel for the State, the proof was excluded, and the defence reserved exceptions to the ruling.

The charge of the court presented the law of insanity as follows : —

" You have seen from the definition of murder, in a former part of this charge, that one of the ingredients of this crime is that the person guilty of the homicide must be of ' sound mind and discretion.' The law is that no act done in a state of insanity can be punished as an offence.

" On the trial of every criminal action, where the facts have been proved which constitute the offence, it devolves upon the defendant to establish the facts or circumstances

on which he relies to excuse or justify the act charged against him. Every person charged with crime is presumed to be sane — that is, of sound memory and discretion. If, under the law of this charge and the testimony of the witnesses, the guilt of the defendant has been established beyond a reasonable doubt, it devolves on the defendant to establish his insanity at the time of committing the act, in order to excuse himself from legal responsibility.

" That is to say, the burden of proof to establish his plea of insanity devolves upon the defendant, as every person is presumed to be of sound mind until the contrary is shown by proof. If the State has, as before explained, proved the facts which constitute the offence charged in the bill of indictment, your next inquiry will be, has the defendant established by proof his plea of insanity, or has it been established by proof from any source? If he has, the law excuses him from criminal liability, and you should acquit him.

" The question of insanity of the defendant has exclusive reference to the act with which he is charged, and the time of the commission of the same. If he was sane at the time of the commission of the crime, he is amenable to the law. As to his mental condition, with reference at the time to the crime charged, it is peculiarly a question of fact, to be decided by you from all the evidence in the case, before the act, at the time, and after. A learned judge has laid down a rule which I give you in charge; that is, he says : 'A safe and reasonable test in all cases would be, that whenever it should appear, from all the evidence, that at the time of doing the act the prisoner was not of sound mind, but affected with insanity, and such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted.' For, in such a case, reason would be at the time dethroned, and the power to exercise judgment would be wanting. But this unsoundness of mind or affection of insanity must be of such a degree as to create an uncontrollable impulse to do

the act charged, by overriding the reason and judgment and obliterating the sense of right and wrong, and depriving the accused of the power of choosing between right and wrong as to the particular act done. Whether the insanity be general or partial, whether continuous or periodical, the degree of it must have been sufficiently great as to have controlled the will of the accused and to have taken from him the freedom of moral action. Where reason ceases to have dominion over a mind proven to be diseased, it then reaches the degree of insanity where criminal responsibility ceases, and accountability to the law, for the purpose of punishment, no longer exists. Whether that degree of insanity existed, at the time of the alleged homicide, with the defendant, is the important question on this issue for your consideration and decision; it being purely a question of fact, to be determined by you from the testimony. If it was true that the defendant took the life of the deceased, and at the time the mental and physical machine had slipped the control of the defendant, or if some controlling mental or physical disease was in truth the acting power within him, which he could not resist, and he was impelled without intent, reason, or purpose, he would not be accountable to the law. If, on the other hand, he was of sound mind, capable of reasoning and knowing the act he was committing to be unlawful and wrong, and knowing the consequences of the act, and had the mental power to resist and refrain from evil, his plea of insanity would not avail him as a defence.

    " You will remember, in the definition of murder in the first part of this charge, it is made an essential ingredient of murder that the person, to be guilty of that crime, must be one of 'sound mind and discretion;' the meaning of which is, that he must have capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing. Although a man may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences; if he has a

knowledge that it is wrong and criminal, and mind sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, such partial insanity is not sufficient to exempt him from responsibility for his criminal acts.

" But if the mind was in a diseased and unsound state to such a high degree that for the time being it overwhelmed the reason, conscience, and judgment, and the defendant in committing the homicide acted from an irresistible and uncontrollable impulse, then it would be the act of the body, without the concurrence of the mind. In such a case there would be wanting the necessary ingredient of every crime — the intent and purpose to commit it. As before stated, every person charged with crime is presumed to be sane, and the burden of proof to establish the defence of insanity devolves on the defendant. It is not necessary that the insanity of the defendant should be established beyond a reasonable doubt; it is sufficient if it be established to your satisfaction by the weight or preponderance of evidence — such and so much proof as reasonably satisfies you of the existence of insanity at the time. To ascertain the condition of the defendant's mind at the time of the killing, you should look to the condition of his mind before that time, — his conduct, acts, and all the surroundings, — ascertain, if possible, whether his mental condition was such as to enable him to know he was doing a wrongful and unlawful act. Look to his acts, conduct, and movements on the day, before, and on the occasion of the killing; his conduct, acts, and movements after the killing, and all other facts in the case, to reach a correct conclusion as to whether the defendant was of sound mind or not."

*W. S. Herndon* and *Giles & Cate* filed able briefs on behalf of the appellant.

*Thomas Ball*, Assistant Attorney-General, and *Hart & Buchanan*, for the State.

HURT, J.   The appellant was convicted of murder in the first degree, with the death-penalty affixed as the punishment.   The record presents three questions for our solution : —

1.  When the plea of insanity is interposed, is the burden of proof on the State to show sanity, or is it on the defendant to prove insanity?

2.  If the jury have a reasonable doubt of the sanity of the defendant, should they acquit or convict, sanity being the only question in the case?

3.  Can the proof be so plenary on one side as to justify the court below in the rejection of legitimate and proper testimony in behalf of the other side?

First proposition :   When the plea of insanity is interposed, is the burden of proof on the State to show sanity, or is it on the defendant to prove insanity?   Brush from this question the dust of ancient days, separate it from its old companions, and its solution is perfectly simple.   Before entering upon an analysis of this subject, permit us to allude to some very strange and inconsistent expressions used by the learned judges in treating of this question.   The following are of the number alluded to :  "As *insanity excuses the commission of crime*, on the ground that the actor is not a responsible being," etc.   " The *onus* of proving the defence of insanity, or, in the case of lunacy, of showing that the *offence* was committed when the prisoner was in a state of *lunacy*, lies upon the prisoner."   " It is rather in the nature of a *plea to the jurisdiction*, or a motion to *change the venue*.   The defendant, through his counsel and friends, comes in and says that he is not *amenable* to penal jurisdiction."   A very respectable volume could be made of such remarks, but those cited will suffice for our purpose.

Let us take a steady look, for a moment, at these propositions.   For example, take the first.   What sane mind can comprehend the possibility of a *crime* being committed by an *insane* person?   If the prisoner is *insane*, there is no

*crime.* If there be *crime,* there is no *insanity.* ↕ Insanity cannot *excuse* crime, from the fact that, if *insane, there is no crime to be excused.* These observations apply to the second. Now to the third: " Plea in the nature of a plea to the jurisdiction." This plea never draws in issue the *guilt* of the prisoner. Under this plea, sanity or insanity *would* be the issue, separate and independent from the question of guilt, to be determined. But the court *has jurisdiction of the crime,* if any has been committed; and how are we to sever the one from the other? Shall we first try the question of sanity, and then that of guilt? Not so ; for on the threshold we are met with the fact that, under the plea of not guilty, evidence on the question of sanity can be introduced. Behold what darkness and confusion surround the question of sanity! a subject around which gather more vagaries and inconsistencies than infest any other question in the whole range of criminal jurisprudence.

But what shall be said upon the proposition that the plea is " in the nature of a motion to change the venue? " If there is the faintest, the most remote analogy existing between the plea and a motion to change the venue of a case, we frankly confess our inability to trace it. We had thought the object of a motion to change the venue was to remove a cause from the county in which the indictment was found to some other one for trial, and that the ground of removal was based upon the fact that an impartial trial could not be had in the proper county — that in which the indictment was found. To what court or county shall it be taken? Will not the same reasons for the change be found in the court or county to which it is transferred? Most unquestionably they will. These conclusions being true, the case could only find a court of last resort in the tribunal of heaven. This would defeat the ends of human justice, since the primal idea upon which it is based carries with it the further idea of *human expiation for human wrong.*

These strange and inconsistent expressions which we find in the writings of eminent text-authors are the legitimate offspring of fundamental error which underlies their treatment of this entire subject, and we merely allude to them here to intensify and concentrate attention upon this parent error, from whose fruitful loins have sprung all of these ill-considered statements upon this question of sanity. In jurisprudence nothing can be more valuable than terse statements of principle. On the other hand, hastily conceived and unhappily worded enunciations not infrequently open the flood-gates of litigation, with its vast attendant expense, and lead to judicial murder under all the forms and solemnities of the law.

The fallacy of this fundamental error can be made more fully to appear by comparing two propositions : —

1. *Sanity is an inherent, intrinsic element of crime.*

2. Sanity is not an inherent and intrinsic element, but is extrinsic and independent of the crime.

The last proposition contains a monstrous fallacy, the fruits of which are visible in so many of the text-books, and which are followed out in many of the enunciations in the adjudicated cases. If *sanity* is an *inherent* element of crime, no well-ordered mind can stop short of the conclusion that the State must carry its burden and prove it. Feeling the force of this, writers have treated it as an *extrinsic* matter, separate and distinct from the question of guilt, and hence those strange and incomprehensible expressions above referred to.

Let us pay our respects to this last proposition, and see if from a bare touch it will not crumble to dust. "Sanity is *extrinsic.*" Therefore the prisoner is to be tried for the act, and the question of *intent* or *malice* is not drawn in issue. This for the simple reason that an issue formed upon the question of intent or malice irresistibly includes that of sanity ; for *there can be no intent or malice without sanity.* Therefore it follows from this erroneous position that the

jury, in viewing the act sought to be punished, must strip it of the *intent* which prompted it, and look alone to the *act*. To this we enter our solemn protest.

We now invite attention to what we believe to be the true position, which is that *sanity is an inherent, intrinsic, and necessary element of crime.* Is this a correct proposition? Is it not a self-evident proposition? If murder can be committed without intent or malice, then the proposition is false; if not, it is true. But we do know, if it be possible to know anything, that, to constitute murder, the act of killing must be attended not only with the *intent* to kill, but with *malice;* and we also know, with the same degree of certainty, that there can be no intent or malice without *sanity.* It therefore follows, beyond any shadow of doubt, that sanity is an inherent, intrinsic, and necessary ingredient of crime.

We now return to the first proposition stated at the beginning of this opinion, which is as follows: "When the plea of insanity is interposed, is the burden of proof on the State to show sanity, or is it on the defendant to prove insanity?" We have thus stated the proposition because we find it *so* stated in the books, but it is not a practical one. There is no such plea known to our Code as applicable to a trial of a criminal cause. We have four pleas, — two special, and the pleas of "guilty" and "not guilty,"— and this plea of "not guilty" is a denial of every material allegation in the indictment. Under it, evidence to establish the insanity of the defendant, and every fact whatever tending to acquit him, may be introduced. It follows that under this plea the defendant denies every constituent element of the offence charged, and this plea of "not guilty" is the same as if the defendant had denied specifically each element of the crime charged.

This leads us to the consideration of the charge in this case, which is murder, and is defined thus: "Every person with a sound memory and discretion who shall unlawfully

kill any reasonable creature in being, within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder." From this definition it follows that, to constitute this offence, the slayer must be " of sound memory and discretion ; " a " reasonable creature " must be slain, and the slayer must be actuated by " malice." We have then, first, " sound memory" in the slayer ; second, a " reasonable creature " slain ; and the slayer prompted by " malice." These constitute *murder*, and nothing less than all of these can constitute murder. By what principle of logic, reason, or justice can either of these elements be eliminated from the offence? From this it follows that an indictment charging this offence embraces all the above elements, whether specifically named or not ; and though the indictment omits to charge that the defendant was of " sound memory," yet charging " malice," *sanity* is necessarily included. The problem which equals murder is composed of three members : First, " sound memory " of slayer ; second, " reasonable creature " slain ; and, third, " malice " in the slayer.

Let us see if we can eliminate from this problem one of these members, and leave every element of the offence in the problem. There can be no " malice " without *sanity;* hence, " malice " includes *sanity*. We therefore have, first, a " reasonable creature" slain ; second, a malicious slayer — murder. Hence the charge in the indictment, that the killing was with " malice aforethought," charges the slayer to be of " sound memory and discretion." If this conclusion is not correct, we most unhesitatingly assert that the indictment is worthless ; for we have found, under our Code, *sanity* to be an element of *murder*, and, by well-settled rules of criminal pleading, an indictment which fails to embrace in its allegations all of the constituent elements of the offence is fatally defective. The authorities approach nearer to unanimity upon this question than any other known to us.

If the above analysis be correct, and we think it is, it devolves upon the State to prove every *inherent* element of the offence; and as we have found *sanity* to be such an element, it rests upon the State to prove *sanity*.    Still holding with a firm grasp the proposition that sanity is an *inherent* element of the offence, and as there is no such thing in law as separating the *elements* of an offence so as to cast the burden of a *part* upon the State, and, *as to the rest,* to require the defendant to take the burden of proving a negative, it follows that the existence of each element is an *affirmative* proposition, the proof of which rests with the State.    The idea that the burden of proof shifts is in direct conflict with the philosophy of criminal jurisprudence, and at war with fundamental principles; for we hold that, with regard to necessary ingredients, it never shifts.    If two or more elements constitute an offence, which of these elements must be proven by the State, and which must be proven *not* to exist by the defendant?    If *elements*, do they not all stand upon the same plane, or are there some which prove themselves?    If there are, they are not *elements*.    Are we to require the defendant to prove the non-existence of that element — sanity — upon which *intent* and *malice* depend, and yet hold the State to prove *intent* and *malice?* To us it is impossible to harmonize, logically, these positions.

We are now led to meet the most plausible, difficult, and potent position which can be assumed upon the other side. And we here concede that it is supported by the weight of authority; but we do not think it is founded in principle, and if not founded in principle, to follow would be dangerous.    It is this: The fact of killing being admitted, and that beyond doubt the prisoner did the killing, and sanity being the normal condition of all persons, the law presumes the prisoner sane until he shows to the contrary; and therefore the burden of proving *insanity* rests with the prisoner. It will be seen at once that the struggle is with this presumption of sanity.

Let us move quietly but closely up to this gentleman, and try to see who he is. The name of this witness is *presumption*. He is a venerable gentleman. He was contemporary with the first-born principles of enlightened jurisprudence. For truth and integrity he has never been excelled by any witness. His means of knowledge are unsurpassed, having for a foundation the laws of nature, and the truth of his evidence is corroborated by the experience of man through all ages. The effect of his evidence is the production of not only a mere *prima facie* case, but full and complete conviction when not opposed. Upon his evidence alone, when not contradicted, sanity being the only issue, man has been made to expiate the violated law with his life. When he speaks to the sanity of the prisoner, his evidence meets with an approving response in the mind of every intelligent and honest juror, for their experience corroborates his testimony. But he is not infallible. He never testifies to the sanity of any *particular individual*. His is never *positive*, but always *presumptive* evidence. Sanity being the normal condition of man, he *presumes* that to be the condition of the prisoner. With the parents or relatives of the prisoner he is not acquainted. He is not aware of the fact that perhaps some of the prisoner's blood-relatives are now inmates of an asylum for the insane. Though his locks are bleached by the winters of ages; though he has never been charged with prejudice, and though his evidence is supported by the laws of nature and corroborated by the experience of man, yet he is somewhat *arbitrary*. He places the prisoner in the normal condition of man, which is *sanity*, and demands of him the same conduct whether sane or insane. He *never heard of insanity*, because he speaks alone from the laws of *nature*, and *insanity* being an *exception* to the natural rule, they are unacquainted. With the prisoner's language, conduct, or misfortunes he has nothing to do, and of them he is entirely ignorant. Yet he holds him with an iron grasp to the laws of nature and the

experience of man. Is he omnipotent? How many witnesses are necessary to measure arms with this Titan? Does he partake of the kingly character, and can he "do no wrong?" Upon the testimony of one witness alone, the prisoner may be legally convicted and executed. Can this gentleman's evidence accomplish more? In no case can he accomplish more than can be effected by the evidence of one witness. We do not mean the evidence of *any witness*. Can the evidence of one witness ever be an overmatch for him? In some cases it legally and justly can; in others the testimony of scores will not suffice, this depending always upon the character of the witnesses, their means of knowledge, and the *facts sworn to*.

Having endeavored to become somewhat acquainted with this witness *presumption*, we now desire to call special attention to a very remarkable feature of his character. It is conceded by all that his evidence is relied upon, and is absolutely necessary to convict, in a great many cases in which the *question* of *sanity* is *not* involved. It is also conceded, under our decisions, that in *these very cases* the burden of proof *does not shift*, but remains with the State throughout. Now, upon what principle of logic or justice can we give to this *presumption* so much power in a case involving the question of *sanity* as to *shift* the *burden* to the *prisoner*, and in the other cases hold that it does *not shift?*

In *Ake* v. *The State*, 6 Texas Ct. App. 398, Judge White makes an extract from the opinion of Judge Bigelow in the case of *The Commonwealth* v. *McKee*, 1 Gray, 61. From it we give the following: "The general rule as to the burden of proof in criminal cases is sufficiently familiar. It requires the government to prove, beyond a reasonable doubt, the offence charged in the indictment, and if the proof fails to establish any of the *essential ingredients necessary to constitute* the *crime*, the defendant is entitled to an acquittal. This results not only from the well-estab-

lished principle that the presumption of innocence is to
stand until it is overcome by proof, but also from the *form
of the issue* in all criminal cases tried on the merits, which,
being always a general denial of the crime charged, neces-
sarily imposes on the government the burden of showing
affirmatively the existence of every material ingredient
which the law requires in order to constitute the offence.
If the act charged is justifiable or excusable, no criminal
act has been committed and the allegations in the indict-
ment are not proved. This makes a broad distinction in
the application of the rule as to the burden of proof in
civil and criminal cases. In the former, matters of justifi-
cation or excuse must be specifically pleaded in order to be
shown in evidence, and the defendant is therefore, by the
form of his plea, obliged to aver an affirmative, and thereby
to assume the burden of establishing it by proof; while in
the latter all such matters are open under the general issue,
and the affirmative — viz., proof of the crime charged —
*remains in all stages of the case* upon the government.'

The quotation being ended, Judge White proceeds : "As
thus enunciated, we believe the doctrine to be correctly
asserted, and we know of no decision of any of the courts
in this State which has ever contradicted or contravened
it."

We ask special attention to the *doctrine* enunciated by
Judge Bigelow, and which is affirmed by our own judge in
the opinion above quoted from, which is as follows : " The
burden of proving *every essential element necessary* to *con-
stitute* the offence is with the government, and this *remains,
in all stages* of the case, upon the government." This rule
applies only to the burden of proof of the *necessary ingre-
dients* of the offence, and, as Judge White further and
properly states, " when *distinct substantive* matter is re-
lied upon by the defendant to *exempt him from punish-
ment* and *absolve him from liability*, then that is *matter
foreign* to the issue as made by the State in her charge

against him, and the burden of proving it, in reason, common sense, and law, should be upon the defendant.'' The italics are ours.

From the above we deduce these rules : —

1. The *State must prove every necessary ingredient* of the *offence*, and, so far as they (the *ingredients*) are concerned, the *burden* of proof *never shifts.*

2. When *distinct, extrinsic* matter is relied on by the defendant, the burden is on him to prove it to the satisfaction of the jury.

To these rules we give our hearty assent. But the grand, fundamental question here again presents itself : ''Is sanity a *necessary element* of crime? '' We have said all we desire to say on this question.

We now propose to return to that plausible position of the other side, ''The evidence showing the act to have been done by the defendant, and sanity being presumed by the law, the burden shifts to the defendant.'' Those who occupy the other side plant themselves upon this proposition, and ask with plausibility, and a great show of victory, '' Will not the prisoner be convicted if he fail to introduce evidence of his insanity? '' We admit that he will, and justly. But suppose the evidence shows that the defendant killed the deceased intentionally, with a deadly weapon, and here closes. Will not the prisoner be convicted if he fail to introduce evidence in *excuse or justification?* Let us take another case : The State proves, by a number of unimpeachable witnesses, that the deceased was brutally murdered by some one in the perpetration of rape, and witness after witness has sworn to the identity of the prisoner as being the perpetrator of the foul deed, and, in addition to all this, the State proves, by a number of witnesses, facts strongly tending to prove the presence and guilt of the prisoner. If the case closed here, *would not the prisoner be in very great danger of losing his life?* Can *presumption* make a *stronger case than this?* Bear in mind that the

above facts constitute *the case* before the court, and the judge should charge the law applicable to *the case* as made by the facts. Now suppose, in this case, the State having closed, the prisoner proves, by a number of his neighbors, that he was at another place at the time the offence was committed, and adds fact upon fact in support of their evidence in favor of an *alibi*. This would be quite a *different case* from the first, but *the case*. Now, suppose the judge should *split* the last case just where the State closed (notwithstanding *the case* as made by all the evidence), and charge that the burden of proof shifted to the prisoner to prove his *alibi*. Would that be held sound law in this State? By no means, and for the simple reason that if the prisoner *was not there* he is not guilty. An *alibi* strikes at the very heart of the proposition of guilt, and every particle of evidence in its support, though negative in its character, is a direct attack upon the theory of his presence at the place of the crime; and, if not there, he is not guilty. And here we would call attention to another source of confusion (in our judgment), which is that many judges fall into the error of viewing *the case*, not *as a whole*, but in its different *stages*, and apply the law in their charges to these stages. This *splitting up* of a case into several parts, and, by the charge, shifting the burden first upon the one and then upon the other party, is against law and principle. In every criminal prosecution the *guilt* of the prisoner is the *objective point*, and every step, every move, every element of the offence, and any fact which is necessary to arrive at that point, is *affirmative* in its very nature; and, as to any of these, the burden *never* shifts.

We have found, in this supposed case of murder, that if the defendant failed to introduce evidence he would likely forfeit his life; but *we have also found that the burden in that case did not shift*. Now, suppose the State proves that the prisoner deliberately, and with a deadly weapon, kills the deceased, and here the evidence closes. Must the

State go further, and prove sanity, by introducing a witness to that point? By no means, for *sanity* is not in *the case*. But suppose the prisoner piles fact upon fact tending to show insanity, must the court charge that the burden in this case is on the prisoner?

Is this a stronger case than the one above put? We think not. Then, can any sound, logical reason be given for shifting the burden in the last and not in the first case? Most unquestionably not. We have found that proof of an *alibi* is a direct attack upon the theory of the defendant's presence at the place of the crime. Proof of insanity is, therefore, an attack upon sanity, and if this is gone, there is no intent, no malice; and if these are wanting, there is no murder, no crime. If there is a mistake in these conclusions, we are not capable of reasoning upon any subject, for these are our settled and honest convictions.

We therefore conclude that, since *sanity* is an *essential, inherent element* of *murder*, and since the State must prove all of the *necessary* ingredients of the offence charged, we cannot escape the conclusion that the State must prove sanity; and as we have found that the burden of proof does not shift in regard to necessary *ingredients* of the offence, and as sanity is such an ingredient, it also follows that the burden of proof is upon the State to show *sanity*, and not upon the defendant to prove *insanity* — a negative. This rule has no application to cases in which the question of sanity is not raised; nor do the rules applicable to *alibi* in all cases, good faith and mistake in theft, etc., have any application in cases in which the *facts do not call for them*.

Now, let us see if we can put these principles into active operation; for, unless practical they are valueless. The jury is sworn and the plea of " not guilty " entered by the prisoner. The charge is murder. The burden is on the State to prove guilt. The State proves the killing by the defendant, with a deadly weapon; the wound was mortal, the act deliberate, and not attended with any circumstances of mit-

igation, extenuation, or justification. But here we are met with the objection that there is no proof of sanity. Not so; for the State has the evidence of that venerable and impartial witness, the truth of whose statements is corroborated by the laws of nature and the experience of man. He is the first witness in every case, and at the very threshold proclaims the sanity of all persons. He not only proclaims sanity, but, when certain facts are proved, he swears to the existence of malice. Not only so, but, when an injury is inflicted, he testifies to the fact that the party inflicting the injury intended so to do. Take the above case, with the testimony of this witness *presumption* in connection with the other facts, and if the evidence closes there, the defendant would and should be convicted. But, the State having closed, the defendant proves fact after fact tending to show the want of sanity. Shall we try him by the presumption or by the facts on the *question of sanity*, or by both the presumption and the facts? If this witness is infallible; if he cannot err; if his evidence is conclusive on the question of sanity, then we should try him by the *presumption*, which would be no trial at all. But, as he knows nothing of *this* case, and since his evidence is not conclusive when opposed by other evidence, but very powerful, and conveying evidence of a presumptive character, we should try the defendant by *both*. The trial proceeds; the defendant proves fact after fact tending to show the want of sanity; but there is the evidence of that old, hoary-headed witness, who is without partiality or prejudice; who is not related to either of the parties, and who is incorruptible, proclaiming the sanity of the defendant. The jury draw upon an experience which corroborates the truth of his evidence; but, as he knows nothing of the sanity of this particular prisoner, his evidence being of a presumptive character, and not conclusive, the struggle throughout the trial is between his evidence and that of the defendant. The defendant closes, and the old witness *presumption* appears to be crushed; but

in comes the State with the evidence of witness after witness swearing to facts tending to show sanity, thus corroborating this witness presumption; and thus the jury try the case by the evidence of this witness presumption, in connection with *all* the evidence on the question of sanity, giving to each witness and all the evidence their due and proper weight, just as in other cases in which the question of sanity is not involved. It will be seen, therefore, that the evidence of this witness *presumption* is to be taken in connection with all of the other evidence, he being treated as a witness in the case.

By a careful survey of the above positions it will be perceived that the burden of proof is quite a different thing from the means or instruments of proof. We have not time here to elaborate this position. We have now said all we desire to say upon the burden of proof, concluding that it never shifts in regard to the necessary ingredients of the offence.

The court below charged the jury that the burden of proving insanity was upon the defendant. This, we think, was error. 17 Mich. 111; 16 N. Y. 58; 2 Metc. 240; 1 Gray, 61; 7 Metc. 500; 31 Ill. 385; *The State* v. *Crawford*, 14 Am. L. Reg. (n. s.) 23; 43 N. H. 224; 19 Ind. 170; *United States* v. *McClane*, 7 Law Rep. (n. s.) 439.

The next proposition is: "Must the State prove sanity beyond a reasonable doubt?" If sanity is a necessary ingredient of crime, and if it be necessary to prove the ingredients of crime beyond a reasonable doubt, the conclusion that it (sanity) must be proved beyond a reasonable doubt cannot be resisted. Hence the settlement of the first proposition — viz., that sanity is an inherent, intrinsic, necessary element of crime — conclusively settles the last proposition, if the *doubt can be applied to the necessary ingredients*. To illustrate: The *defence* is the *want* of sanity, or *alibi*, or good faith, or mistake, or any other matter which will defeat guilt; now, is it proper to specifi-

cally apply the doubt to either of these grounds? Take, for example, the *fraudulent* intent in theft, and assume that the facts are of such a character as to make this the only question. Upon this the defendant makes his contest. Would it be *wrong* for the court to apply the doubt *directly* to this part? We think not. Then, if the doubt can properly and justly be specifically applied to *one* ingredient of an offence, why not to others, if they are made prominent by the situation of *the case.* If the court, by its charge, calls special attention to the defence or defences urged by defendant, and then applies the doubt to the whole case, we are not to be understood as holding that this would be error. But suppose the defendant asked that the doubt be pointedly and directly applied to his defence or defences, would it be right or wrong for the court to thus apply it? This brings to the front the *right* or *wrong* of the principle.

Now, it is conceded by all that if there be a doubt of the guilt of the defendant the jury must acquit, and as there can be no guilt without *sanity*, a doubt of *sanity* would therefore be a doubt of guilt. If it be proper to acquit upon doubt of guilt, how can it be wrong to acquit upon a doubt of sanity, upon which guilt necessarily depends? Would an honest and just man convict, if he had a well-founded and reasonable doubt of the prisoner's sanity? We think not. Would justice demand his conviction, or would not reason, humanity, and justice imperatively require his acquittal? Then, if upon a well-founded, reasonable doubt of *sanity, justice demands his acquittal,* is it wrong for the court to so state in its charge? Must *justice be put to shame, driven to the rear,* and *forced to ensconce herself behind some other proposition?* Has not the prisoner the right to have her brought to the front, face to face with the jury, and the jury to be made to pass upon her merits? In every trial, justice should be kept in the front rank, and not driven to the rear with the stragglers and camp-followers. We therefore conclude that, when requested by the pris-

oner, the court should charge the jury that if they have a reasonable doubt as to the sanity of the prisoner they should acquit. *Hatch* v. *The State*, 6 Texas Ct. App. 384; *Robinson* v. *The State*, 5 Texas Ct. App. 519; *Kay* v. *The State*, 40 Texas, 29. This charge was asked and refused in the Webb case, decided at this term (*ante*, p. 490), in which action of the court we think there was error.

From the statement of facts in this case, it will be found that the defendant stated that he was compelled to kill deceased; that he had taken supper at his sister's, near Hilliard's, and on his way home was passing Dr. Harrington's, when he got after him with a pistol and ran him down, when he wheeled and shot him. The State introduced these statements. It further appears, from the horse-tracks, that deceased was running his horse along the road in the direction of the person who shot him, and also that the deceased fell in the road, and that his pistol was lying by him. The killing was in the night, and was not seen by any person. Under these facts, defendant proposed to show that just before, or a short time before the killing, deceased threatened to kill the defendant. This being objected to by the State, the court sustained the objection; to which the defendant excepted, and reserved a proper bill of exceptions. It is conceded by the assistant attorney-general that this evidence was admissible, but contended that the defendant is not injured by its rejection, because the facts establish overwhelmingly that defendant was waylaying the deceased, and that the right of self-defence was thereby forfeited. It will be seen that, under this state of case, our third proposition is found, viz.: "Can the proof be so plenary on one side as to justify the court below in the rejection of legitimate and proper evidence in behalf of the other side?" To this proposition our answer must be in the negative. To hold the contrary would make the court the judge of the weight of the evidence and the credibility of the witnesses, which is imperatively and invariably the province of the

jury.   There can be no *case* until the evidence is closed on both sides, and then, and not till then, can it be properly termed *the case*.   This evidence, which legally and justly constituted a part of *the case*, being rejected, the jury passed upon a part, and not the whole case ; which must, of necessity, result in injury to the defendant.

When the court charged the burden to be on the defendant to show insanity, we think there was error, and that the rejection of evidence of threats was also error.   For these the judgment must be reversed and the cause remanded.

WHITE, P. J., and WINKLER, J.   We concur in the above opinion reversing the judgment, but cannot give our assent to the views or conclusions expressed with regard to the question of insanity.   Our views upon this subject will be found in the opinion in the case of *Webb* v. *The State, ante,* p. 490, recently decided by this court.

The law presumes every man to be sane, and that presumption alone will of itself sustain the burden of proof which is devolved upon the State in every criminal case, so far as sanity is involved, until it is rebutted and overcome by satisfactory evidence to the contrary.   Naturally, and in fact, the burden to rebut this presumption rests with and is upon the defendant ; and he should be able to show his insanity clearly, and to that extent that the minds and consciences of the jury can say that on account of his insanity he was guiltless of entertaining the criminal intent essential to responsibility for the crime charged.   This is not only required by the general rule of law, but is implied in the statute, which requires that " when the defendant is acquitted on the ground of insanity, the jury shall so state in their verdict."   Code Cr. Proc., art. 722.   It is unnecessary to determine whether the defendant shall establish his insanity beyond a reasonable doubt or by a preponderance of testimony ; all that is required is, that he shall establish it to the satisfaction of the jury, who are the judges of the fact.

*The Commonwealth* v. *Eddy*, 7 Gray, 583; *Ortwin* v. *The Commonwealth*, 76 Pa. St. 414; 1 Hawley's Am. Cr. Law, 283, 297; *Lynch* v. *The Commonwealth*, 77 Pa. St. 205.

As to reasonable doubt, if the charge applies this to the whole case, this will satisfy the demands of the law.

*Reversed and remanded.*